# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**THEODORE P. DANES**,

            Plaintiff,

v.                                                          **Case No. 04-C-594**

**SENIOR RESIDENTIAL CARE OF AMERICA, INC.**,

            Defendant.

---

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

---

      Theodore P. Danes ("Danes") filed suit against his former employer, Senior Residential Care of America, Inc. ("SRC") on June 21, 2004, alleging that he was discriminated against on the basis of sex as a result of sexual harassment and that he was retaliated against by being terminated for complaining of this harassment, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., as amended.

      Danes alleges in his complaint that he was involved in a voluntary romantic relationship with Dawn Sebert ("Sebert"), President of SRC. In 2003, he states that he sought to end the relationship, but Sebert continued to pursue him. When Danes refused Sebert's advances, she allegedly threatened his job. Danes complained to Jerry Kallas ("Kallas"), the owner of SRC, but Kallas took no action. Danes then met with Kallas and Ann George ("George") of SRC's human resources department approximately October 6, 2003, and discussed his complaints of sexual

1

harassment. On January 6, 2004, Danes wrote a memorandum to Sebert, requesting that the sexual harassment cease. He provided a copy of this memorandum to SRC's human resources department and to Kallas. A few hours after Danes provided a copy of this memorandum to Kallas, Kallas called Danes into his office and issued him written discipline. Later that same day, Danes was terminated by Kallas.

On approximately January 14, 2004, Danes filed a charge of sexual harassment and retaliation against SRC with the Equal Employment Opportunity Commission ("EEOC") and cross-filed with the Wisconsin Equal Right Division. Danes was issued a Notice of Right to Sue on that charge by the EEOC dated March 22, 2004.

SRC answered Danes' complaint, asserting nine affirmative defenses including that the relationship between Danes and Sebert was consensual, that SRC was unaware of any alleged harassment, that Danes was justifiably terminated for legitimate, non-discriminatory reasons, that Danes failed to exhaust administrative remedies, and that Danes failed to file this action within ninety days of receiving his right to sue letter.

The case was transferred to this court after the parties consented to the full jurisdiction of a magistrate judge. The parties have completed their necessary discovery and on September 21, 2005, SRC filed a motion seeking summary judgment. An earlier motion for summary judgment by Senior Residential Care was denied without prejudice as being premature. The pleadings on the motion for summary judgment are closed and the matter is ready for resolution.

## FACTUAL SUMMARY

Danes alleges that in April of 2003, soon after a consensual dating relationship began in February of 2003, he began efforts to pull away from Sebert. (Danes Dep., pp. 29-30) He alleges that he made twenty to twenty-five attempts to pull away from Sebert and that whenever he did so,

2

Sebert would remind Danes that she was the president of SRC and threaten to make his life difficult. (Danes Dep., pp. 44-45) Danes alleges that Sebert acted upon these threats by repeatedly increasing his workload. (Danes Dep., p. 46) In an effort to maintain his job, Danes made efforts to appease Sebert, even going so far as to propose to her. (Danes Dep., pp 32-35) However, Danes states that he felt pressured into proposing because Sebert told him what engagement ring to buy, how to buy it, and when to give it to her. (Danes Dep. pp. 32-33)

On March 14, 2003, Danes and Sebert disclosed their relationship to Kallas and both assured Kallas that the relationship was consensual. (Danes Dep. pp. 38-43; Kallas Dep., p. 36) On June 5, 2003, Danes, Sebert, and Kallas, all signed a document memorializing the March 14, 2003 conversation, and again confirming that the relationship was entirely consensual. This document is included in the record as Exhibit 1 to Danes' Deposition. Danes states that he felt coerced into signing this statement because Sebert told him that it was in his "best interests to sign it." (Danes Dep., p.38)

In late September of 2003, Danes made his first attempt to formally end the relationship. (Danes Dep., p. 30) Soon after this, on October 2, 2003, Sebert repeatedly asked Danes for a hug. (Danes Dep., p. 51) Danes tried to avoid doing this by changing the subject but eventually gave in and gave Sebert a hug. (Danes Dep., p. 51) As a result, Danes developed an erection and Sebert asked him if he would like to "go someplace with her and take care of that." (Danes Dep. Ex. 2) Danes then left Sebert's office. Later that evening, Sebert called Danes on his cell phone but Danes did not answer the call. (Danes Dep., p. 56) Prior to Sebert's call, Danes' son had tried to reach Danes at Sebert's house. (Danes Dep., p. 57)

The next morning, Sebert called Danes into her office and complained about his failure to answer this phone the night before. (Danes Dep., p. 60) Danes states that Sebert told him that he

3

would only call her for business and he had better answer her calls. (Danes Dep. Ex. 2) Sebert allegedly went on to say that she could not fire Danes because of the contract he had signed with Kallas and therefore would simply make his job intolerable and force him to resign. (Danes Dep., p. 61)

Danes states that later that same day he met with Kallas and George to complain of Sebert's sexual harassment and on October 6, 2003, he wrote a letter, in the record as Exhibit 2 to Danes' Deposition, memorializing that meeting. Also in October of 2003, Danes left voicemail message for Sebert in which he referred to her as "madam fucking president" and said that he had seen how she treated other people and that she should "go ahead and crush me if you want to." (Sebert Dep., p. 58) Sebert informed Kallas of this message and he asked, "What would you like me to do about it, Dawn?" (Sebert Dep., p. 126) Sebert replied that she did not want anything done but that she just wanted to make Kallas aware that she felt it crossed the line between personal and professional conduct. (Sebert Dep. p. 126)

On October 7th, Sebert asked that Danes have a cigarette with her. Danes initially declined but then agreed. (Danes Dep. Ex. 2) While smoking together, Sebert touched Danes' elbow. (Danes Dep. Ex. 2) In response, Danes went inside. (Danes Dep. Ex. 2) The following day, Sebert contacted Danes and said that she did not believe that the marketing team was performing appropriately and if performance did not improve, someone would have to be let go. (Danes Dep., p. 69) In this conversation, Sebert reminded Danes that if someone was let go, Danes' workload would increase. (Id.)

Danes spent Thanksgiving with Sebert and her parents. Danes testified that he did this because he was afraid that refusing would negatively impact his employment and because he wanted to hunt with his son. (Danes Dep. pp. 86-87) Danes also testified that he spent Christmas

4

Eve with Sebert and her parents, including bringing her parents gifts, again because he was concerned about losing his job if he refused. (Danes Dep. p. 87) Up until late-November or early-December, 2003, Danes and Sebert were planning on traveling together to Louisiana to visit Danes' family. (Sebert Dep., p. 65) However, it was eventually decided that Danes would travel alone because Sebert's family would be in town for the holidays. (Id.) Sebert eventually learned Danes' ex-wife would be in Louisiana. (Sebert Dep. pp. 67-70) Sebert concluded, inaccurately, that Danes had gotten back together with his ex-wife. (Sebert Dep., pp. 68-70)

On December 18, 2003, Danes suggested to other employees that they all stage a walkout while Kallas and Sebert were out of the office. (Danes Dep., p. 105) Although most employees who heard Danes' suggestion took it as a joke, (Crawford Dep., pp. 48-50), George and an assistant in the human resources department considered Danes' suggestion sufficiently serious to inform Kallas and they did so on January 6, 2004. (George Dep., pp. 93-96)

Also on January 6, 2004, Danes' first day back after his trip to Louisiana, Danes found on his desk a marketing memorandum from Sebert, included in the record as Exhibit 3 to Danes' Deposition. In this memorandum, Sebert references a fax dated January 2, 2004, and talks about how to respond to a competitor. Sebert goes on to explain that the company will now be keeping weekly records of marketing contacts and other marketing activities, requests some marketing materials so she can set up a marketing strategy, requests a report that was due three months ago, requests a training schedule from Danes, and informs Danes of matters concerning his subordinates. At the bottom of the letter, "I'm sure I'll have more to ask for," is handwritten above the signature, "DS."

Danes took this memorandum as sexual harassment and therefore he prepared a letter to Sebert, included in the record as Exhibit 4 to Danes' Deposition. In this letter, addressed to Sebert

5

at an address in New Berlin rather than her business address, Danes explains that he had been documenting her harassment for some time, that he had met with Kallas and the human resources department, and says that his inability to break off the relationship because of her threats has been stressful. He then complains of Sebert's efforts to find out if Danes' ex-wife had accompanied him on his recent trip to Louisiana. Danes then asks Sebert to stop harassing and threatening him. The letter notes that copies were sent to "Jerry Kallas," "Ann George/HR," "My Attorney," and "File." Danes delivered these letters by placing the letters in the recipients' respective office mail slots.

After Danes returned from his lunch, Kallas summoned Danes to his office to discuss Danes' earlier proposal of a walkout. (Danes Dep., p. 114) Danes maintained that his proposal of a walkout was just a joke, but Kallas chose to discipline Danes in the form of a written reprimand. (Danes Dep., p 117; Kallas Dep., p. 57). Danes expressed his displeasure with the discipline by using a raised voice and stated that he believed that Kallas was reprimanding him because of his complaint of Sebert's harassment and said that Kallas was going to have to address the matter with Danes' attorney. (Danes Dep., p. 118) Kallas responded with a raised voice. (Id.) The degree of hostility and anger in this exchange is disputed by the parties. Danes left Kallas' office and returned to his office and began to prepare his response to the written discipline. (Danes Dep., pp. 118-21) Soon after Danes had left Kallas' office, Kallas came to Danes' office with the written discipline. (Danes Dep., pp. 123-25) Danes began to write on it and Kallas told him not to. (Danes Dep., p. 123) Danes did so anyway. (Id.) Kallas then left and returned less than a minute later and fired Danes. (Danes Dep., p. 124) After requesting his personnel file, Danes returned to his desk to pack up his belongings. (Danes Dep., p. 125)

After Danes had been terminated and as he was packing up his belongings, Kallas alleges that he then retrieved his mail, including Danes' letter in which he alleged that Sebert had been

6

sexually harassing him. (Kallas Dep., p. 60-61; Kallas Dep. Ex. 6, ¶ 13) However, Danes alleges that he noted that his letter had been removed from Kallas' mail slot after Danes had returned from lunch. (Danes Dep., pp. 114-15)

After Danes had left the office, Kallas then met with Sebert and suspended her, stating that he needed to investigate Danes' allegations of harassment. (Kallas Dep., pp. 74-75; Sebert Dep., p. 96) The following day, Sebert protested her suspension and was reinstated while the matter was investigated. (Sebert Dep., p. 104)

## SUMMARY JUDGMENT STANDARDS

A motion for summary judgment will be granted when there are no genuine issues as to material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). As provided under Rule 56(c), only "genuine" issues of "material" fact will defeat an otherwise "proper" motion for summary judgment. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Material facts are those facts which, under the governing substantive law, might affect the outcome of the suit. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute of such material facts is "genuine" if the evidence is such that a reasonable trier of fact could find in favor of the nonmoving party. Id.

The movant bears the burden to establish that there is no genuine issue of material fact and that he or she is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144, 159 (1970); see also Celotex Corp., 477 U.S. at 323. The moving party satisfies its burden by demonstrating "that there is an absence of evidence to support the nonmoving party's case." Celotex Corp., 477 U.S. at 325. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. Anderson, 477 U.S. at 255; Cain v. Lane, 857 F.2d 1139, 1142 (7th Cir. 1988); Spring v. Sheboygan Area School Dist., 865 F.2d 883,

7

886 (7th Cir. 1989). Further, "on summary judgment, a court can neither make a credibility determination nor choose between competing interests." Sarsha v. Sears, Roebuck & Co., 3 F.3d 1035, 1041 (7th Cir. 1993).

If the moving party meets its burden, the nonmoving party then has the burden to present specific facts showing that there is a genuine issue of material fact. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).

## ANALYSIS

### A. Quid Pro Quo Sexual Harassment Claim

Danes opposes summary judgment exclusively on his claim of quid pro quo sexual harassment and therefore potential claims relating to sexual harassment in the form of a hostile work environment need not be considered. Thus, the defendant's motion for summary judgment as to Danes' Title VII hostile work environment claim shall be granted.

Danes' facts that are potentially relevant to a claim of quid pro quo sexual harassment, restated here very briefly, are that he was subjected to unlawful discrimination on the basis of sex because his former girlfriend, who was also his supervisor at work, added additional work burdens and threatened to make his work environment difficult so that he would quit, unless he continued the relationship with her.

SRC replies arguing that summary judgment is appropriate because the sexual advances were not unwelcome, any allegedly unlawful conduct was not motivated because of Danes' sex but merely because of the failure of the relationship, and that there was no tangible effect on Danes' employment.

The EEOC Guidelines on Sexual Harassment, 29 C.F.R. § 1604.11(a), define quid pro quo sexual harassment as: "Unwelcome sexual advances, requests for sexual favors, and other verbal

8

or physical conduct of a sexual nature constitute sexual harassment when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment" [or] "submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual." In order to prove a claim of quid pro quo sexual harassment, a plaintiff must satisfy the following five part test: "(1) that she or he is a member of a protected group, (2) the sexual advances were unwelcome, (3) the harassment was sexually motivated, (4) the employee's reaction to the supervisor's advances affected a tangible aspect of her employment, and (5) respondeat superior has been established." Bryson v. Chicago State University, 96 F.3d 912, 915 (7th Cir. 1996).

"[W]hen an employer penalizes an employee after the termination of a consensual relationship, a presumption arises that the employer acted not on the basis of gender, but on the basis of the failed interpersonal relationship -- a presumption rebuttable only if the employee can demonstrate that the employer demanded further sexual relationships before taking the action he did." Keppler v. Hinsdale Township High School Dist., 715 F. Supp. 862, 869 (N.D. Ill. 1989) (citing Huebschen v. Dep't of Health and Soc. Servs., 716 F.2d 1167 (7th Cir. 1983)); see also, Holtz v. Marcus Theatres Corp., 31 F. Supp. 2d 1139, 1148 (E.D. Wis. 1999).

In the present case, it certainly appears that Sebert's alleged quid pro quo sexual harassment was motivated by the failure of the consensual relationship and not necessarily because of Danes' gender. Therefore, the presumption arises that Danes' claim must fail. However, Danes' may rebut this presumption if he can demonstrate that Sebert demanded a further sexual relationship after the failure of the relationship but before taking or threatening the action that affected a tangible aspect of Danes' employment. Thus, central to this determination is when the relationship ended. This is a fact disputed by the parties.

Danes alleges that he attempted to end the relationship twenty to twenty-five times beginning in April of 2003 but each time Sebert threatened to make his work life difficult if he ended the relationship. He further alleges that the relationship was nonconsensual at the very time he signed an agreement stating that it was entirely consensual. Evidence supporting the conclusion that the relationship remained consensual are the facts that Danes had proposed to Sebert, that Danes and Sebert spent Thanksgiving and Christmas together, and that Danes and Sebert had made plans visit Danes' family in Louisiana. If the relationship ended when Danes alleges it did, Danes sufficiently alleges that Sebert threatened to take adverse employment actions if the sexual relationship was not continued. However, if the relationship continued until some later date, it is unclear whether Sebert demanded a further sexual relationship or if Sebert merely expressed dissatisfaction with the failed relationship by increasing Danes' workload. Expressing dissatisfaction with the failure of a relationship by increasing workload of a former partner, without the demand that the relationship be continued, does not constitute quid pro quo sexual harassment. Thus, the fact of when the relationship ended is a disputed material fact that can be determined only upon assessing credibility. Similarly, the welcomeness of any sexual advances is a disputed material fact that requires an assessment of credibility.

Finally, SRC argues that Sebert's actions did not tangibly affect Danes' employment. To prove that he was subject to quid pro quo sexual harassment, Danes must demonstrate that Sebert did or threatened to take actions that affected his "terms, conditions, or privileges of employment." 42 U.S.C. § 2000e-2(a)(1); see also, Russell v. Bd. Of Trs. Of Univ. of Ill., 243 F.3d 336, 341 (7th Cir. 2001). Whether or not something constitutes a materially adverse employment action will ordinarily "depend on the facts of each situation." Byrson, 96 F.3d at 916. "While what is considered adverse is defined broadly, 'not everything that makes an employee

10

unhappy is an actionable adverse action.'" Haugerud v. Amery Sch. Dist., 259 F.3d 678, 691 (7th Cir. 2001) (quoting Smart v. Ball State Univ., 89 F.3d 437, 441 (7th Cir. 1996)). When determining if an action constitutes an adverse employment action, a court must assess both the qualitative and quantitative changes in the terms or conditions of the plaintiff's employment. Id. (citing Dahm v. Flynn, 60 F.3d 253, 257 (7th Cir. 1994).

Here, Danes does not allege that Sebert threatened to terminate Danes' employment if he chose not to continue the relationship. Rather, Danes alleges that Sebert threatened to make his life at work difficult and to "crush him" if he "crossed" her. (Danes Brief at iii) Specifically, Danes alleges that Sebert increased his workload in response to his refusal to continue the relationship. Although Danes was eventually terminated, he was not terminated by Sebert, and therefore this fact is relevant only to Danes' retaliation claim, discussed below. Thus, the question is whether, under the facts as alleged by Danes, an increased workload can constitute an adverse employment action?

Whether or not an increased workload alone can constitute an adverse employment action is unclear in the Seventh Circuit. Ordinarily, a plaintiff must make a prima facie showing of how his increased workload differed from other similarly situated co-workers. See Feingold v. New York, 366 F.3d 138, 153 (2d Cir. 2004); Zhou v. Pittsburg State Univ., 252 F. Supp. 2d 1194, 1215-16 (D. Kan. 2003). When there are similarly situated co-workers and the plaintiff's workload increase is disproportionate, it may be easier to recognize the action as discriminatory. However, in the present case, there is no evidence to suggest that Danes had any similarly situated co-workers and therefore this factor is inapplicable.

Under the facts of this case, the court concludes that Danes' allegedly increased workload is sufficient to permit a jury to determine whether it constitutes an adverse employment action.

Numerous factors lead the court to this conclusion. First, is the fact that Danes alleges that Sebert told him that she sought to increase his workload to such an onerous degree that Danes' would have no other option but to leave his job. Second, there is the fact that the Seventh Circuit has broadly construed what constitutes an adverse employment action. Oest v. Ill. Dep't of Corr., 240 F.3d 605, 612 (7th Cir. 2001) (citing Smart v. Ball State Univ., 89 F.3d 437, 441 (7th Cir. 1996)); Haugerud, 259 F.3d 679 at 691; Collins v. Illinois, 830 F.2d 692, 703 (7th Cir. 1987). Third, is the fact that the Seventh Circuit has recognized that a decrease in work responsibilities can constitute an adverse employment action. Hoffman-Dombrowski v. Arlington Int'l Racecourse, Inc., 254 F.3d 644, 651 (7th Cir. 2001); Fortier v. Ameritech Mobile Communs., 161 F.3d 1106, 1112 (7th Cir. 1998); Dahm v. Flynn, 60 F.3d 253, 257 (7th Cir. 1994); Crady v. Liberty Nat'l Bank & Trust Co., 993 F.2d 132, 136 (7th Cir. 1993). An increase in responsibilities, particularly when not accompanied by any increase in compensation or authority, has the potential of being more onerous and detrimental than a decrease of responsibilities.

### B. Retaliation Claim

Title VII prohibits retaliation against an employee who has engaged in activity protected by Title VII. 28 U.S.C. § 2002e-3(a). The rationale for this provision is to ensure that employees are provided "unfettered access" to Title VII's remedial mechanisms. Robinson v. Shell Oil Co., 519 U.S. 337, 346 (1997). The Supreme Court recently held that for a plaintiff to prevail on a claim of retaliation, he need demonstrate only that the employer took an action that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington Northern & Santa Fe Ry. v. White, 2006 U.S. LEXIS 4895, *26-*27 (quoting Rochon v. Gonzales, 438 F.3d 1211, 1219 (D.C. Cir. 2006)) (internal quotation marks omitted). However, "petty slights or minor annoyances" are insufficient to constitute retaliation. Id. at *27. In

determining whether a particular action is sufficiently materially adverse to constitute retaliation, the context of the action, including all of the surrounding circumstances, must be considered. Id. at *29, *32-*33.

To establish a prima facie case of retaliation, the plaintiff may proceed under the direct or the indirect method of proof. Haywood v. Lucent Techs., Inc., 323 F.3d 524, 531 (7th Cir.2003); Rogers v. City of Chicago, 320 F.3d 748, 753 (7th Cir. 2003). Under the direct method of proof, the plaintiff must establish (1) a statutorily protected activity; (2) an adverse employment action taken by the employer; and (3) a causal connection between the two. Davis v. Con-Way Transp. Central Express, Inc., 368 F.3d 776, 786 (7th Cir.2004). To satisfy the third element of the direct method, a plaintiff must point to an outright admission by the decision maker that the challenged action was undertaken because of the plaintiff's protected activity, or circumstantial evidence that forms a "convincing mosaic" that shows the discriminatory intent by the decision maker. Rhodes v. Illinois Dept. of Transp., 359 F.3d 498, 504 (7th Cir.2004).

Alternatively, the plaintiff may proceed under the indirect method. In Stone v. City of Indianapolis, 281 F.3d 640 (7th Cir.2002), the Seventh Circuit enunciated the new rule for proving retaliation under the indirect method. Rogers, 320 F.3d at 755. Under Stone, a plaintiff must show that after filing the [complaint of discrimination] only she, and not any similarly situated employee who did not file a complaint, was subjected to an adverse employment action even though she was performing her job in a satisfactory manner. Id. Breaking this test into its elements, Danes must show the following: (1) that he engaged in a statutorily protected activity; (2) that he met the employer's legitimate expectations; (3) that he suffered an adverse employment action; and (4) that he was treated less favorably than similarly situated employees who did not

13

engage in statutorily protected activity. Moser v. Indiana Dept. of Corrections, 406 F.3d 895, 903-04 (7th Cir. 2005).

If the defendant presents no evidence in response, the plaintiff is entitled to summary judgment. Rogers, 320 F.3d at 755. If the defendants present unrebutted evidence of a noninvidious reason for the adverse action, they are entitled to summary judgment. Otherwise there must be a trial. Id. This clarified rule is a variation of the familiar burden-shifting method found in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and eliminates the requirement, noted in some of this circuit's earlier decisions, that the plaintiff prove a "causal link" between the protected action and an adverse employment action. Id. (citing Stone, 281 F.3d at 642-44).

Danes' alleges that as a consequence of his complaints of the Sebert's harassment, he was the recipient of retaliation. Specifically, Danes alleges that he was given written discipline and eventually terminated under the pretext that he had engaged in insubordinate conduct of attempting to stage an employee walkout, for raising his voice to his boss in challenging the discipline, and refusing to abide by his boss' order not to write on the discipline.

Significant to a determination of whether Danes' discipline and subsequent termination were legitimate or pretextual is when Kallas received Danes' letter complaining of Sebert's alleged sexual harassment. Danes alleges that the letter had been removed from Kallas' mailbox when Danes returned to the office and before Kallas called Danes into his office. Kallas, however, insists that he did not receive the letter until after he had fired Danes. If Kallas had received the letter immediately before firing Danes, the temporal proximity of the two events creates a sufficient dispute so that the matter may not be resolved by summary judgment. Therefore, the

14

issue of when Kallas received Danes' letter is a disputed material fact and the defendant's motion for summary judgment as to Danes' retaliation claim must fail.

**IT IS THEREFORE ORDERED** that the defendants' motion for summary judgment as to plaintiff's Title VII hostile work environment claim is **granted**.

**IT IS FURTHER ORDERED** that the defendants' motion for summary judgment as to the plaintiff's Title VII quid pro quo sexual harassment claim is **denied**.

**IT IS FURTHER ORDERED** that the defendants' motion for summary judgment as to the plaintiff's Title VII retaliation claim is **denied.**

The court will conduct a telephone conference on Wednesday, **August 2, 2006**, at **8:30 a.m.** to discuss further scheduling. The court will initiate the call.

Dated at Milwaukee, Wisconsin this <u>18th</u> day of July, 2006.

s/AARON E. GOODSTEIN
United States Magistrate Judge
